## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ROBERT E. NICHOLS, ) | |
| ) | |
| Plaintiff, pro se, ) | **MEMORANDUM OPINION**, |
| ) | **ORDER, AND RECOMMENDATION** |
| v. ) | |
| ) | 1:08-CV-275 |
| UNIVERSAL FOREST PRODUCTS, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on a motion for summary judgment by Defendant Universal Forest Products (docket no. 25). The pro se Plaintiff has responded in opposition to the motion by filing his own motion for summary judgment (docket no. 31). Also pending before the court is a motion for discovery and for extension of time to conduct discovery (docket nos. 32, 34) filed by Plaintiff. The parties have responded to the respective motions; therefore, the matter is ripe for disposition. Furthermore, the parties have not consented to the jurisdiction of the magistrate judge. Therefore, all dispositive motions must be addressed by way of recommendation. For the following reasons, it will be recommended that the court grant Defendant's motion for summary judgment and that the court deny Plaintiff's motion for summary judgment. Furthermore, Plaintiff's motion for discovery and for an extension of time will be denied.

**BACKGROUND**

This case involves claims of race discrimination and retaliation in employment pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e,

and 42 U.S.C. § 1981.  On April 24, 2006, Plaintiff Robert Nichols filed a charge with the Equal Employment Opportunity Commission ("EEOC") claiming Title VII discrimination, retaliation, and constructive discharge against his former employer Defendant Universal Forest Products, allegedly based on Plaintiff's race, African-American.  On or around September 12, 2006, the EEOC issued a "right-to-sue" notice to Plaintiff.  On December 11, 2006, Plaintiff filed a Complaint in the Western District of North Carolina.  On April 16, 2008, the case was transferred to this district.  Plaintiff's pro se Complaint asserts the following five claims: (1) denial of equal pay/work; (2) "general harassment"; (3) retaliation; (4) discrimination; and (5) "defamation of character." (Compl. at 3-4.) The Complaint, which is a form complaint for pro se plaintiffs, states that Plaintiff is alleging violations of both Title VII and Section 1981.

**FACTS**[1]

Plaintiff is an African-American (black) male.  Plaintiff was employed by Defendant from March 30, 2005, until February 21, 2006, when he resigned.  (Def.'s Attach. A, EEOC Charge; Dep. II at 193:7-10.)  Sharon Clontz, Defendant's Shipping Department Supervisor, hired Plaintiff as a first-shift forklift driver at $9.50 per hour.  (Clontz Aff. ¶ 3.)  During that same time, David LeDoux (a white male), and Jason Smith (an African-American male) also worked on the first shift as forklift drivers.

---

[1] Because Plaintiff's version of the facts is disjointed and rambling, the undersigned has set forth the statement of facts as presented by Defendant, noting where a fact may be disputed by Plaintiff.

(*Id.*)  Forklift drivers primarily unload and load lumber from trucks or railroad cars, place the lumber in the lumber yard, and clean up lumber dropped in the yard.  (Dep. I at 9:19 to 10:1, 11:13-19, 16:16-23.)  As a supervisor, Clontz observed that LeDoux and Smith unloaded more trucks than Plaintiff and that Plaintiff was not as consistent with the proper use of the forklift as LeDoux and Smith.  (Clontz Aff. ¶¶ 4-5.)  Clontz asserts that she spoke with Plaintiff about his performance, but Plaintiff's performance did not improve.  (*Id.* ¶ 6.)  Plaintiff contends in his unsworn response that Clontz "never warned [him] of any problem she felt I had" and that he was never written up, except once for being tardy.  (*See* Pl.'s Response p. 6.)

On May 11, 2005, Plaintiff was reassigned to a laborer position in Shipping. (Richard Aff. ¶ 4; Clontz Aff. ¶ 6.)  As a laborer, Plaintiff's pay was $8.25 per hour until May 29, 2005, when Plaintiff received a pay increase to $8.50 per hour.  (*Id.*) In the laborer position, Plaintiff never received a pay decrease, and was never counseled or disciplined by Clontz or any other supervisor or manager.  (Dep. II at 147:17 to 148:14.)

In October 2005, Clontz gave Shipping employees, including Plaintiff, a survey to complete about Clontz's performance.  (Richard Aff. ¶ 9; Dep. I at 78:23 to 79:14, 90:21-25.)  Plaintiff did not write anything on the survey that was "personal" to him, that described his working relationship with Clontz, or any comments regarding race. (Dep. I at 79:18-25, 91:1-14; Dep. II at 29:7 to 30:18.)  Plaintiff claims that Clontz retaliated against him for comments that he wrote on the survey by, among other

-3-

things, assigning him on one occasion to move a heavy railroad log. (Dep. I at 82:12 to 83:5.)

On October 20, 2005, Clontz was demoted to a forklift driver position in the Treatment Department. (Richard Aff. ¶ 10.) Thereafter, Clontz and Plaintiff were no longer working in the same department, and Don Overman replaced Clontz as the Shipping and Receiving Supervisor. (*Id.*) In January 2006, Overman decided to make several changes in Shipping to improve efficiency. (*Id.* ¶ 11; Overman Aff. ¶¶ 5-6.) For instance, Overman wanted forklift drivers to be more responsible for removing spacers and pieces of lumber they had dropped in the lumber yard. (Richard Aff. ¶ 11; Overman Aff. ¶ 6.) Overman also decided the clerks and the forklift drivers would begin handling certain decking orders. (*Id.*) As a consequence of these changes, Overman decided to find another assignment for Plaintiff. (Richard Aff. ¶ 12; Overman Aff. ¶ 7.) Overman discussed these changes with George Meyers, the Plant Manager, as well as other supervisors to find available positions for Plaintiff. (*Id.*) David Corriher, the Fencing Department Supervisor, offered Plaintiff an open machinery position where Plaintiff had the potential to earn up to $16.50 per hour, which was almost double the amount he was making as a laborer. (Corriher Aff. ¶¶ 2-3; Dep. I at 140:22 to 141:18; Dep. II at 154:20 to 155:13.) If Plaintiff had accepted the position, he would have started out making $12.87 per hour. (Corriher Aff. ¶ 3.) Although Plaintiff stated that he "had no problem" working with Corriher and he knew that the position being offered to him

-4-

would increase his hourly rate, Plaintiff declined the offer with no explanation and never spoke with Corriher about it again.  (Dep. I at 141:18-19; 148:21-25, 151:2-7; Dep. II at 155:8-23.)

On January 27, 2006, Overman explained the changes in Shipping and his decision to locate another position for Plaintiff; however, Plaintiff testified that he did not want to listen to Overman.  (Overman Aff. ¶ 8; Dep. II at 156:6 to 157:4, 157:9 to 163:4.)  According to Plaintiff, Overman "didn't have a chance" to discuss any open positions for him because Plaintiff refused to speak with him about it.  (Dep. I at 166:9-15.)  Indeed, Plaintiff admitted that he did not allow Overman or Meyers to find a new position for him because he resigned before they could do so.  (Dep. I at 166:9-15, 167:3-13.)

Plaintiff alleges that during the time he worked as a laborer, Plaintiff's white co-worker Josh Tarlton used racial slurs towards Mexicans, African-Americans, and homosexuals.  (Attach. B at 8; Dep. II at 84:9-25.)  Specifically, Plaintiff testified that one time Plaintiff overheard Tarlton use the "N-word" in a conversation with another person.  (Dep. II at 84:18 to 85:23.)  Tarlton was not directing the slur towards Plaintiff.  (*Id.*)  Plaintiff also testified that Tarlton would sometimes make racial comments or jokes about African-Americans.  (Dep. II at 88:7 to 89:1; 89:22-25.)  Plaintiff never spoke with Tarlton about the racial jokes and never reported the jokes to a supervisor.  (Dep. II at 89:11-21, 91:16-20.)  Plaintiff testified that he only spoke

-5-

to one other co-worker, Donna Keener, about the jokes, and he had "hoped" that Keener would report it to their supervisor.  (Dep. II at 90:20 to 91:20.)

Plaintiff also contends that Clontz "harassed" him by instructing forklift drivers to relay work-related messages to Plaintiff that included curse words.  (Attach. B. at 6; Dep. I at 52:8 to 53:2, 62:19-23; Dep. II at 12:5-11, 12:22 to 18:7.)  Plaintiff admitted in his deposition that Clontz cursed in front of many employees, not just Plaintiff.  (Dep. II at 17:20 to 18:7.)  Plaintiff testified that "all race problems" with Tarlton and "problems" with Clontz stopped when Clontz was demoted in late October 2005, and when Tarlton's employment ended on November 3, 2005.  (Dep. II at 91:21 to 92:24, 93:6-20, 163:5 to 164:17.)  Plaintiff has admitted that he never heard a member of management, including Clontz, make any racial statements, racial slurs, or anything that could be considered comments based on race.  (Dep. II at 143:8 to 144:13.)  Plaintiff testified, however, that he heard "rumors" that Clontz was racist and that she was also generally difficult to work with, regardless of an employee's race.  (Dep. II at 168:20 to 169:23; 169:24 to 171:7. )

As part of his discrimination claim, Plaintiff contends that after he became a laborer, he was not allowed to be "certified" as a forklift driver.  (Attach. B at 7; Dep. I at 173:25 to 174:7.)  Some employees in Shipping typically attend forklift licensing classes.  (Richard Aff. ¶ 8.)  Laborers, however, do not receive this training.  (*Id.*)  Jessie Maxwell, another laborer in Shipping, was also never certified as a forklift driver.  (Dep. II at 63:7-17.)

Plaintiff resigned from his employment on February 21, 2006. (Attach. B at 8-9.) Plaintiff offers various reasons for why he quit his job: because of the "racial slurs" made by Tarlton; because of Clontz "giving him more work duties"; and because he didn't feel protected at work from harassment and retaliation. Plaintiff also contends that, after complaining to his supervisors, rather than helping him with his problems, Defendants decided to take Plaintiff's job from him and give it to a white female. (*Id.* at 8.) Specifically, Plaintiff testified that he believed that another employee named "Angie" was being trained for his laborer job on February 18, 2006, and that Defendant planned to fire Plaintiff. (*Id.* at 8; Dep. II at 192:18-23.) Plaintiff came to this conclusion by speaking with one former and one current employee, neither of whom had any personal knowledge of the alleged "training." (Dep. I at 151:20 to 156:24, 158:7 to 163:10; Dep. II at 115:5 to 116:17.) Plaintiff never asked his supervisor or any member of management whether anyone was being trained for his position. (*Id.*) Defendant contends that, in fact, no one was being trained to replace Plaintiff in his laborer position. (Richard Aff. ¶ 18; Overman Aff. ¶ 9.)

Plaintiff also contends that he quit because of "problems" he had with co-workers. (Attach. B at 8; Dep. II at 113:22 to 115:1.) These "problems" consisted of two isolated incidents of personal disagreements between Plaintiff and a co-worker, Donna Keener, that were not related to Plaintiff's race. (Dep. I at 130:30 to 140:15; Dep. II at 107:11 to 115:4.) Plaintiff further admitted in his deposition that

-7-

"[m]y whole claim is nowhere near on race . . . . My whole claim is not on race. I wouldn't . . . say that I quit because of racism." (Dep. I at 70:4-7.)

Plaintiff testified in his deposition that the final reason that he quit on February 21, 2006, was because he speculated that a manager had scolded one of Plaintiff's co-workers for suggesting to Plaintiff that he call a third party about his problems in the workplace. (Dep. I at 31:13-20, 32:20-23, 33:3-11, 34:14-22, 38:19-22; Dep. II at 120:6-12; Attach. B at 9.) Plaintiff admitted in his deposition that he had merely "assumed" that the co-worker had been scolded because of the way she acted towards him. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986);

-8-

*Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

## DISCUSSION

In support of the summary judgment motion, Defendant first contends that Plaintiff's Title VII claims of racial discrimination, hostile work environment, harassment, and equal pay are all time-barred. Pursuant to 42 U.S.C. 2000e-5(e)(1), a plaintiff must file an EEOC Charge within 180 days of the alleged discriminatory act. Defendant notes that on April 24, 2006, Plaintiff filed his only EEOC Charge claiming race discrimination, harassment, retaliation, and constructive discharge. Defendant contends, therefore, that events occurring before October 21, 2005, are outside the 180-day time limit for filing the EEOC Charge. Defendant further notes that Plaintiff admitted in his deposition that "there were no problems with race" after Plaintiff's former supervisor Clontz was demoted on October 20, 2005. Defendant further contends that Plaintiff has failed to cite a single incident of alleged harassment, discrimination, or retaliation based on race after October 21,

2005.  Defendant contends that Plaintiff's claims for Title VII discrimination, "equal pay," harassment, and hostile work environment are therefore untimely.

In response to Defendant's contention that his discrimination claims are time-barred, Plaintiff contends that the discriminatory behavior did not end when Clontz's employment ended and that he continued to face discrimination at work even after October 21, 2005.  Plaintiff contends that his Title VII claims are, therefore, not time-barred.  The undersigned finds that it is not necessary to dwell on whether Plaintiff's Title VII claims are time-barred because, in any event, Plaintiff's claims of discrimination arising under both Title VII and Section 1981 are wholly lacking in merit, and Defendant is entitled to summary judgment for the reasons stated herein.

In his form pro se Complaint, Plaintiff alleges race discrimination, harassment, and hostile work environment pursuant to Title VII and Section 1981.  Title VII makes it unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  It is well settled that Section 1981 employment discrimination claims are subject to the same merits analysis as Title VII claims.  *See Bittle v. Elec. Ry. Improvement Co.*, 576 F. Supp. 2d 744 (M.D.N.C.

2008) (noting that Section 1981 claims are analyzed in the same manner as those brought under Title VII). To satisfy ordinary principles of proof in discrimination cases, a plaintiff must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Because it is often difficult for a plaintiff to provide direct evidence of discriminatory intent, the Supreme Court has created a burden-shifting structure for analyzing such claims. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this burden-shifting structure, known as the "McDonnell Douglas" framework, the plaintiff must plead facts sufficient to create an inference that an adverse employment decision was based on impermissible considerations. This may be done by showing that (1) the plaintiff is a member of a protected class; (2) the plaintiff was otherwise qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4) the action took place under conditions establishing an inference of discrimination. *See id.* at 802.

Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the challenged action. *Id.* If the employer demonstrates a legitimate, nondiscriminatory reason, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture," and the burden shifts back to the employee to show that the given reason was merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 511 (1993); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995). The responsibility of proving that "the protected trait . . . actually motivated the employer's decision" remains with the plaintiff at all times. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To overcome a motion for summary judgment in such a case, a plaintiff must provide direct or circumstantial evidence "of sufficient probative force" to show a genuine issue of material fact exists as to this question. *Goldberg*, 836 F.2d at 848. With these principles in mind, the court now turns to Plaintiff's discrimination claims. Because Plaintiff has failed to provide any direct evidence of racial discrimination, the court must apply the burden-shifting framework of *McDonnell Douglas*.

I first note that, in response to Defendant's motion for summary judgment, Plaintiff has produced no evidence that is admissible on summary judgment. Plaintiff produced only an unsworn statement in which he sets forth inadmissible hearsay and rambling, speculative, and vague assertions regarding each of his claims. (*See* docket no. 33.) Plaintiff has failed to submit any admissible evidence on summary judgment despite a letter from this court dated October 27, 2008, in which the court explained to Plaintiff the requirements of responding to Plaintiff's motion for summary judgment, including the requirement that Plaintiff must submit an affidavit or other evidence. (*See* docket no. 27.) Furthermore, the court warned Plaintiff of the consequences of failing to submit such evidence. Despite the warning from the

-12-

court, Plaintiff merely submitted an unsworn statement to the court. Therefore, Plaintiff has submitted no evidence to dispute the material facts on summary judgment. Because Plaintiff has failed to set forth any specific facts to support a genuine issue for trial, and instead rests on "mere allegations or denials," his response does not meet the requirements of Rule 56(e). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (stating that the evidence relied on at summary judgment must meet "the substantive evidentiary standard of proof that would apply at [a] trial on the merits"). For this reason alone, the court could grant summary judgment to Defendant. In any event, the undersigned will address Defendant's motion for summary judgment as to each claim brought by Plaintiff.

Plaintiff's Race Discrimination Claim Based on Title VII and Section 1981

It is well established that for a plaintiff to prove discrimination under Title VII, he must show that the employer took some "tangible employment action" against the plaintiff. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). The Supreme Court has explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* Here, the only tangible employment action Plaintiff identifies in his Complaint is his "demotion" from a forklift driver to a laborer position. (Compl. at 4.) Plaintiff cannot, however, meet the second and fourth elements of the prima facie case–that is, he has failed to show that he was otherwise qualified for the position

-13-

or that his demotion took place under conditions establishing an inference of discrimination. Defendant has produced evidence that Plaintiff's job performance as a forklift driver was substandard. Plaintiff's supervisor Clontz believed that Plaintiff was slow in unloading trucks and operated the forklift in an unsafe manner. Furthermore, when comparing Plaintiff's performance to other Shipping forklift drivers, those drivers unloaded more trucks than Plaintiff. (Clontz Aff. ¶ 4.) In response, Plaintiff offers no evidence to raise an issue of fact as to whether he performed his job as a forklift driver satisfactorily. Moreover, Plaintiff's self-assessment of his own work performance is irrelevant. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (holding that it is the perception of the decision-maker, not the self-assessment of the plaintiff, which is relevant). Therefore, Plaintiff fails to establish a prima face case of race discrimination based on his demotion from a forklift operator to a laborer.

Plaintiff also attempts to claim that Defendant discriminated against him because Plaintiff was not allowed to attend forklift licensing classes while working as a laborer. The inability to attend forklift licensing classes is not a "tangible employment action" within the meaning of Title VII. In any event, as Defendant explained, laborers are not required to attend the certification classes. Moreover, Plaintiff admitted in his deposition that his white co-worker Jessie Maxwell, who also worked as a laborer in Shipping, was also never licensed as a forklift operator. Defendant contends that this was based on a legitimate business decision. In sum,

-14-

I find Plaintiff has failed to raise a genuine issue of fact as to his discrimination claim based on his allegation that Defendant refused to allow him to become licensed as a forklift operator.

Plaintiff also attempts to bolster his discrimination claim by vaguely claiming he was the "only black in the shipping department." (Compl. at 4.) Plaintiff admitted in his deposition, however, that this claim is inaccurate because another African-American male, Jason Smith, also worked in the shipping department from February 28, 2005, until August 23, 2005, three months after Plaintiff moved to the laborer position. (Richard Aff. ¶ 7; Dep. I at 100:19-24.) In addition, Plaintiff's subjective belief, based only on "rumors," that Plaintiff's former supervisor Clontz was a racist cannot create a genuine issue of material fact as to any alleged discriminatory conduct by Defendant. *See, e.g., Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 (4th Cir. 2002) (finding that the affidavits of various employees expressing their subjective beliefs that a supervisor was "racist" were "insufficient to create a genuine issue of material fact as to any discriminatory conduct" by the defendant employer). For these reasons, Plaintiff has failed to present sufficient evidence to withstand Defendant's motion for summary judgment as to Plaintiff's race discrimination claim based on his demotion from forklift operator to laborer.

Furthermore, to the extent that Plaintiff argues in his brief opposing summary judgment that he was "constructively discharged," and that the constructive discharge constituted a tangible employment action under Title VII, Plaintiff simply

fails to produce any evidence to establish constructive discharge as a matter of law. This circuit's court of appeals has held that a constructive discharge occurs only when an employer deliberately makes an employee's working conditions intolerable and thereby forces the employee to quit his job. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). Dissatisfaction with work assignments, the feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004).

Plaintiff has not shown that a reasonable person in his position would have felt compelled to resign. Plaintiff admitted that there were no issues related to race after Clontz left in October 2005, and the primary problems alleged in the last four months of Plaintiff's employment were personal disagreements between Plaintiff and another co-worker. Plaintiff also stated that he finally quit because he had merely assumed that Defendant had scolded another co-worker for giving Plaintiff the telephone number of a third party to call about his employment disputes. Plaintiff also alleges, without any evidence, and without having ever confirmed it with Defendant, that Defendant was training someone else for his job, and he speculates that Defendant was planning to fire him. Plaintiff never discussed his assumption with Defendant, and simply quit before Defendant could address Plaintiff's concerns. Furthermore, Defendant has presented evidence that several of Plaintiff's managers asked Plaintiff not to quit and told him that they could "fix it," and that he was even

-16-

offered a different position that would have paid him more money. (Dep. I at 163:23 to 164:2.) In sum, the evidence on summary judgment simply does not raise an issue of fact as to whether Plaintiff was constructively discharged. *See Laprise v. Arrow Int'l, Inc.*, 178 F. Supp. 2d 597, 608 (M.D.N.C. 2001) (noting that an employee who quits without giving his employer a reasonable chance to take corrective action before resigning is not constructively discharged).

Next, as part of his discrimination claim, Plaintiff also contends that he was denied "equal pay" because of his race. To establish a prima facie case of discriminatory compensation under Title VII, a plaintiff must show (1) that he is a member of a protected class; (2) that he was paid less than a non-minority employee; and (3) that the higher paid employee was performing a job substantially similar to the plaintiff's. *See generally Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994).

Plaintiff has wholly failed to produce any admissible evidence on summary judgment to support his equal pay claim. In support of his "equal pay" claim, Plaintiff claims that his white co-worker Josh Tarlton was hired at the rate of $10.00 per hour, while Plaintiff only made $9.50 per hour. (Attach. B at 5.) Plaintiff admitted in his deposition, however, that he based this claim solely on a conversation with Tarlton. (Dep. II at 123:1 to 124:10.) Defendant has produced evidence on summary judgment to show that, despite what Tarlton told Plaintiff, Tarlton was hired on the same day and earned the same pay rate as Plaintiff, which was $9.50 per hour.

-17-

(Richard Aff. ¶ 6.) Tarlton did not receive an increase in pay until May 29, 2005, weeks after Plaintiff was reassigned into a laborer position. (*Id.*)

Plaintiff also vaguely claims that a forklift driver named "Chuck" moved into a laborer position and that Defendant allowed him to keep his "forklift pay." (Attach. B at 5.) Plaintiff did not know Chuck's last name or when Chuck was allegedly demoted, but he claims that it was sometime after October 20, 2005, the day Clontz was demoted. (Dep. II at 124:11-22, 125:21 to 126:9.) Plaintiff bases this claim solely on alleged conversations with "Chuck." (Dep. II at 124:23 to 125:20.) Defendant notes that Charles Emerson was the only forklift driver referred to as "Chuck." (Richard Aff. ¶ 19.) Defendant has produced evidence to show that Emerson began his employment on October 11, 2005, with a starting hourly rate of $9.50 per hour, which was the same pay as Plaintiff. (*Id.*) Emerson was never demoted and voluntarily resigned on February 19, 2006. (*Id.*)

In response to summary judgment, Plaintiff has produced no evidence to refute Defendant's evidence regarding the pay of either Josh Tarlton or Charles Emerson. Indeed, Plaintiff's only evidence that he was denied equal pay consists of his own, unsworn statement based on hearsay.[2] Because Plaintiff has failed to

---

[2] Furthermore, to the extent that Plaintiff argues in his response that Tarlton should not have been hired at $9.50 per hour (the same as Plaintiff) because Tarlton was not qualified as a forklift operator, Tarlton's qualifications when he was hired, in comparison to Plaintiff's qualifications, are not relevant to Plaintiff's equal pay claim. Defendant notes that it does not require forklift drivers to have past work experience in forklift driving when they are hired; moreover, pay raises are determined by *actual* successful performance after working 45-60 days for Defendant. (*See* Misenheimer Aff. ¶ 3.)

-18-

raise a genuine issue of fact as to his equal pay claim, summary judgment should be granted to Defendant as to this claim.

<u>Plaintiff's Claim of Race Discrimination Based on Hostile Work Environment</u>

As part of his claim of race discrimination, Plaintiff also alleges that Defendant subjected him to harassment and a hostile work environment. To prevail on a hostile workplace claim, a plaintiff must show that: (1) he experienced unwelcome harassment; (2) the harassment was based on his gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001). Title VII does not protect against all unwanted workplace distractions, and behavior such as "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Rather, a plaintiff must show that the harassment was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 192 (4th Cir. 2000). In determining whether the work environment was abusive, courts consider: (1) the frequency of the discriminatory conduct; (2) its severity; (3)

-19-

whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003).

Plaintiff has failed to present evidence sufficient to overcome Defendant's motion for summary judgment as to Plaintiff's claim of discrimination based on hostile work environment. As previously noted, the only conduct related to race that Plaintiff has identified were comments allegedly made by one co-worker, Tarlton. Plaintiff admitted in his deposition, however, that none of those comments were directed to him. Plaintiff merely claims to have "overheard" Tarlton use the "N" word in his conversation with Donna Keener, another co-worker. Plaintiff also testified in his deposition that Tarlton sometimes told jokes about African-Americans, Mexicans, and homosexuals. This evidence is not sufficient to support a claim for hostile work environment based on Plaintiff's race. Therefore, Plaintiff's claim for discrimination based on hostile work environment under Title VII and/or section 1981 cannot withstand summary judgment and the court should grant summary judgment to Defendant as to this claim.

Plaintiff's Claim for Retaliation

Plaintiff also purports to bring a claim for "retaliation" in his pro se complaint. To establish a prima facie claim for retaliation, a Title VII plaintiff must produce evidence from which a reasonable jury could find that (1) he engaged in protected activity under Title VII; (2) that his employer took materially adverse action against

him such that it could dissuade a reasonable worker from making or supporting a charge of discrimination or from otherwise engaging in another form of protected activity; and (3) a causal relationship existed between the protected activity and the materially adverse activity.[3]  *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).  If a plaintiff employee establishes his prima facie case, the burden then shifts to the defendant employer to rebut the presumption of retaliation by articulating a legitimate, nonretaliatory reason for its actions.  *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997).  If the defendant offers a legitimate reason for the adverse action, then the burden shifts back to the plaintiff to show that the stated reason was mere pretext for retaliation by proving both that the reason was false and that discrimination was the real reason for the challenged conduct.  *Id.*

Plaintiff's retaliation claim cannot withstand summary judgment for two reasons.  First, Plaintiff has not shown that he engaged in activity that is protected under Title VII.  Second, he has not shown any "retaliatory" conduct that is actionable under Title VII.  In support of his retaliation claim, Plaintiff testified that the other forklift drivers and his former supervisor Clontz "retaliated" against him because he complained *generally* about his job and his job duties.  (Dep. II at 75:8

---

[3]  The Supreme Court recently held that a retaliation claim may also be brought pursuant to 42 U.S.C. § 1981.  *See CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1955 (2008).  Because Plaintiff's Title VII retaliation claim cannot withstand summary judgment, his Section 1981 retaliation claim likewise fails.

to 76:22, 77:13-18.) Specifically, Plaintiff contends that other forklift drivers "retaliated" against Plaintiff by not helping "take wood off the ground anymore." (Attach. B at 7; Dep. II at 69:24 to 75:20.) Plaintiff also contends that Clontz retaliated against him because of comments Plaintiff wrote on a survey by asking him to move a railroad log and by treating him unfairly in other ways. It is undisputed, however, that Plaintiff did not write anything whatsoever about race on the survey. (Dep. I at 79:18-25, 91:1-14; Dep. II at 29:7 to 30:18.) Plaintiff simply fails to establish a prima facie case of retaliation because Plaintiff's comments on the survey or complaints about his job duties are not protected activity under Title VII because they did not oppose discriminatory practices in the workplace.[4] *See* 42 U.S.C. § 2000e-3. Indeed, Plaintiff admitted in his deposition that his "retaliation" claim was not based on reporting conduct that was allegedly related to race. (Dep. II at 55:4 to 57:11.)

Furthermore, none of the alleged "retaliatory" actions taken against Plaintiff were actionable as retaliation under Title VII. The Supreme Court recently clarified the requirements for proving retaliation under Title VII in *Burlington Northern & Santa Fe Railway Co. v. White*. In *Burlington Northern*, the Court held that to prove retaliation, a plaintiff need not show that the act of retaliation constituted an "ultimate

---

[4] Plaintiff does not and cannot claim that his EEOC Charge filed on April 24, 2006, was the "protected activity" in his retaliation claim, since he filed the EEOC Charge *after* the alleged retaliatory actions by Defendant and *after* he voluntarily resigned in February 2006.

employment decision" such as firing, non-promotion, etc. Rather, for an employer's acts to constitute actionable retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination [or from otherwise engaging in protected activity].'" 548 U.S. at 68 (internal quotation omitted) (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Plaintiff merely claims that Clontz retaliated against him by generally treating him poorly and by telling him on one occasion to move a railroad log by hand. He also contends that forklift drivers "retaliated" against him by refusing to help him remove wood dropped on the ground. None of these actions were materially adverse as a matter of law, i.e., they would not have dissuaded a reasonable worker from making or supporting a charge of discrimination or from otherwise engaging in protected activity. For all of these reasons, the court should grant summary judgment to Defendant as to Plaintiff's retaliation claim.

Plaintiff's Motion for Discovery and an Extension of Time to Conduct Discovery

Next, Plaintiff's motion for discovery and for an extension of time to conduct further discovery will be denied. Plaintiff did not file his motion until well after the discovery deadline had passed, and he has failed to set forth good cause justifying additional time to conduct and receive discovery or show that he diligently pursued discovery. *See* Local Rule 26.1(d).

-23-

<u>Plaintiff's Remaining State Law Claims</u>

Finally, to the extent that Plaintiff attempts to allege state law claims for "defamation of character" and "general harassment,"[5] the court should decline to exercise supplemental jurisdiction over these claims, as it is recommended that summary judgment be granted on Plaintiff's federal claims as set forth above.  *See* 28 U.S.C. § 1367(c).

**CONCLUSION**

For the reasons stated herein, **IT IS RECOMMENDED** that the court **GRANT** Defendant's motion for summary judgment (docket no. 25) as to Plaintiff's claims for race discrimination and retaliation and dismiss these claims with prejudice. Furthermore, the court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  It is further recommended that the court **DENY** Plaintiff's motion for summary judgment (docket no. 31).  Finally, Plaintiff's motion for discovery and extension of time (docket nos. 32, 34) is **DENIED**.

_____
WALLACE W. DIXON
United States Magistrate Judge

December 31, 2008

_____

[5] It is unclear whether Plaintiff intended for his "harassment" claim to be part of his Title VII hostile work environment discrimination claim or part of a separate state law claim for "harassment."  If Plaintiff did intend to allege harassment as a state law claim, the court should decline to exercise supplemental jurisdiction over the claim.